IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BARRY WAYNE REGISTER
A/K/A CHARLIE RAY STARR                                                 PLAINTIFF

      v.                              Civil No.  5:15-cv-05052

SHERIFF TIM HELDER; DR. MULLINS;
NURSE RHONDA BRADLEY; NURSE
TERESA LEE, Administrator for Southern
Health Partners; NURSE HARRIS; and DEPUTY
KATHERINE STANTON                                                      DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

The events that are the subject of this case occurred when the Plaintiff was incarcerated

in the Washington County Detention Center (WCDC).  The Washington County Defendants,

Sheriff Tim Helder, Dr. Mullins, Nurse Bradley, and Deputy Stanton, have filed a motion for

summary judgment (Doc. 110).  The Southern Health Partners, Inc. (SHP) Defendants, Nurse

Teresa Lee and Nurse Lilly Harris, have also filed a motion for summary judgment (Doc. 113).

On Wednesday, January 18, 2017, at 10:00 a.m., a hearing was held to allow the Plaintiff

to testify in response to the summary judgment motions.  Plaintiff appeared by video from the

Polunsky Unit of the Texas Department of Criminal Justice (TDCJ).  In addition, the Plaintiff

submitted a number of exhibits to the Court for consideration (Doc. 120).  He was also given an

extension of time until January 31, 2017, to submit affidavits in support of his response.

### 1.  Background

Plaintiff was extradited from Texas and booked into the WCDC on June 5, 2014.  *County*

*Exhibit* (hereinafter *Cty. Ex.*) A-1 at 12-15.[1]  Custody was temporarily transferred to Washington

County.  *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) A at 6.[2]  He remained incarcerated there until

February 27, 2015, at which time he was transported back to Texas.  *Cty. Ex.* A-1 at 31.

By Order entered on October 16, 2015 (Doc. 100) the following claims were dismissed:

Plaintiff's claim that he could not be charged for medical care; his claims that he was being

charged excessive and illegal amounts for pre-stamped envelopes; his claims about sales tax

being collected on commissary sales; all claims against Jennifer Laub (who was in charge of

commissary); and, the official capacity claims against Nurse Teresa Lee and Nurse Lilly Harris.

Plaintiff claims the Defendants have violated his constitutional rights by: (1) failing to

obtain his medical records from the TDCJ and the Arkansas Department of Correction (ADC);

(2) failing to provide him chronic care free of charge; (3) discriminating against out-of-state

defendants by charging them for care for chronic conditions; (4) failing to allow him to properly

utilize the grievance procedure; and, (5) by not allowing him to be baptized by a Jehovah's

witness rather than a Chaplain of another faith who was  already approved to do baptisms.

Until November 1, 2014, the WCDC employed nurses and contracted with two

physicians to provide medical services.  *Cty. Ex.* A at ¶ 9.  From November 1, 2014, to December

31, 2015, SHP provided all medical care in the WCDC pursuant to a contract with Washington

County.  *Id.* at ¶ 10.  After care is provided, medical staff enter information into the commissary

system to charge inmates for the medical care they receive.  *Id.* at ¶ 11.  "An inmate is not denied

---

[1]Page citations are to the Jail File page number located on bottom center of the page.

[2]Plaintiff did not number all pages of his exhibits and his numbers are difficult to read as a result of the CM/ECF header.  Citations to this exhibit are therefore to the CM/ECF page number which is located in the top right corner of the document.

-2-

care based on their inability to pay.  If an inmate has no money in his/her commissary account, the amount will be . . . shown as a debit on the commissary account but is not collected." *Id.*; *see also Plff's Ex.* H at 130 (Bradley's responses to interrogatories – "inmates are charged for medical visits and medications").

The WCDC "employs an electronic kiosk system for the submission of written grievances and requests." *Cty. Ex.* A at ¶ 12.  Inmates receive responses to their grievances and requests via the kiosk system.  *Id.*  "If an inmate indicates that he/she feel that his/her constitutional rights have been violated, they are provided the name of the [United States District] Court clerk and the address to which they should direct their request for a form for filing a complaint."  *Id.*

The Texas records show that on June 5, 2014, Plaintiff was on chronic care for coronary atherosclerotic disease, hypertension, and Hepatitis C.  *Plff's Ex.* A at 11.  Plaintiff also submitted documents indicating he was on chronic care for Hepatitis A & B and gastroesophageal reflux disease (GERD) in the ADC as of September of 2004.  *Plff's Ex.* B at 50 & 55 (chronic care for Hepatitis B as of 3/8/2005).  On one of the ADC documents Plaintiff submitted, it says "no charges" when he was seen for GERD and Hepatitis B chronic care.  *Id.* at 50.

Plaintiff brought the following medications with him to the WCDC: Metroprolol 25 mg; Nitrostat 0.4 mg; Aspirin 81 mg; Pravastatin 20 mg; and, Enalapril 10 mg.  *Cty Ex.* A-1 at 13.  The WCDC's policy with respect to inmates who arrive at the facility with medication requires the medication to be "verified and approved by the nurse before it is administered."  *Plff's Ex.* F at 101.

Plaintiff reported having had two heart attacks.  *Cty Ex.* A-1 at 118.  He also indicated

-3-

that he had high cholesterol, high blood pressure, had tested positive for tuberculosis in the 1980s, had Hepatitis A, B, and C, and had gallstones. *Id.* He testified he took his cholesterol and high blood pressure medication until the WCDC started charging him for it. *See Cty. Ex.* B at 44-45.[3] Plaintiff testified he suffered no detrimental health issues as a result of his treatment at the WCDC. Specifically, he said he was no worse when he left the jail then when he went in. He did, however, testify that he lost 22 pounds.

Plaintiff's medication administration record (MAR) from June 6, 2014 to June 30, 2014 indicates he refused Metoprolol, Enalapril, and Pravastatin prescriptions. *Cty. Ex.* A-2 at 168-170. His MAR for July through September also indicates he refused the medications. *Id.* at 171-173, 174-176, 177-179. He refused medications from November 10, 2014 until November 13, 2014. *Cty. Ex.* A-2 at 131-133. On November 10, 2014, he signed a SHP release form indicating he was refusing the medication because he was being charged for it. *Id.;* A-1 at 130. He refused to sign these forms each day. *Id.* at 138-166.

On June 6, 2014, Plaintiff submitted a request stating he had gallstones. *Cty. Ex.* A-1 at 186. Nurse Bradley replied that she was waiting for his medical records regarding this problem, and that the jail doctor would determine what treatment was necessary. *Id.*

On June 7, 2014, Plaintiff advised the County Defendants that his TDCJ records were under the name of Charlie Ray Starr. *Cty. Ex.* at A-1 at 187. Nurse Vickery responded saying she had put him on the list to see the doctor. *Id.*

Plaintiff was seen by Dr. Mullins on June 10, 2014, for his complaint of pain in the right upper quadrant of his abdomen. *Cty. Ex.* A-1 at 119. On June 11, 2014, Plaintiff was taken for

---

[3]County Exhibit B is Plaintiff's deposition. Page citations are to the deposition page numbers and not the CM/ECF page numbers.

AO72A
(Rev. 8/82)

abdominal x-rays. *Cty. Ex.* A-1 at 120-121. No gallstones were identified. *Id.* Plaintiff testified that nothing else was done to determine what was causing his pain in his right side. *Cty. Ex.* B at 46-47.

On June 11, 2014, Plaintiff submitted two inmate requests about the TDCJ paying his medical expenses because he was a chronic care patient. *Cty. Ex.* A-1 at 189. Plaintiff's inmate account shows three deductions were made from his account: a prescription charge for $15; an other-the-counter charge for $3; and, a medical charge for $5. *Id.* at 224.

Plaintiff also requested forms to have the state responsible for his medical expenses. *Cty. Ex.* A-1 at 190. The forms he was referring to were release forms authorizing the WCDC to obtain his records. Nurse Bradley explained that the TDCJ did not pay his medical expenses when he was "back for court." *Id.*

On June 12, 2014, Plaintiff asked for the results of the x-rays. *Cty. Ex.* A-1 at 190. Nurse Bradley informed him they were negative. *Id.* Thereafter, Plaintiff submitted a request asking to speak to the Sheriff because he had been diagnosed in Texas as having gallstones while he was told by the WCDC doctor that he had no gallstones. *Cty. Ex.* A-2 at 190-191. He also mentioned being charged for medical care. *Id.* In response, he was added to nurse's call. *Id.*

On August 8, 2014, Plaintiff submitted a request stating he was committed for both the TDCJ and the ADC and should not be required to pay for medical care. *Cty. Ex.* A-1 at 197. He asked that the money that had been deducted for medical care be put back in his commissary account. *Id.* That same day, Nurse Vickery faxed a health service request form to the ADC to obtain his medical records. *Cty. Exs.* A-1 at 123-124; A-2 at 122-124.

On August 12, 2014, Plaintiff submitted a request stating at length how he believed his

-5-

AO72A
(Rev. 8/82)

rights were being violated under both state and federal law. *Cty. Ex.* A-1 at 199-200. He requested copies of all his requests and grievances and for the jail to stop its illegal practices. *Id.* Deputy Stanton replied by telling Plaintiff how to request a §1983 form. *Id.* Plaintiff, however, believes Deputy Stanton sent his grievance to the Clerk of this Court, and that the Clerk replied to the grievance. *Cty. Ex.* B at 54-56. Plaintiff believes this denied him the right to exhaust his grievances at the jail level. *Id.* at 56. He also did not think the response was sufficient. *Id.* at 56-57.

By affidavit, Deputy Stanton indicates that since Plaintiff indicated he believed his federal rights had been violated, she responded by telling him to write to the Clerk of Court to obtain a §1983 form. *Cty. Ex.* D at ¶ 7. Deputy Stanton further stated that other than providing basic aid in emergency situations, she never made any decisions or recommendations with respect to inmate medical care. *Id.* at ¶ 4.

Plaintiff also believed Defendants discriminated against him because he was a Texas inmate who was brought in on a bench warrant. *Cty. Ex.* B at 58. He testified he was aware of some Arkansas inmates who were treated differently, but he could not recall their names. *Id.* Plaintiff believed all of the WCDC inmates except the two Texas inmates were receiving free medical care. *Id.* at 59.

On August 14, 2014, Plaintiff submitted a request addressed to the Sheriff again complaining of being charged for medical care, being forced to violate his medical restrictions, and the medical staff not obtaining his TDCJ and ADC records. *Cty. Ex.* A-1 at 201. That same day, Plaintiff submitted a bottom bunk request. *Id.* at 202.

On October 3, 2014, Plaintiff submitted a request complaining he had been moved back

-6-

upstairs which violated his medical restrictions. *Cty. Ex.* A-1 at 205.  Nurse Bradley replied that

Plaintiff was on a bottom bunk, bottom floor restriction.  *Id.*; *see also Plff's Ex.* B at 56 (noting

bottom bunk/bottom floor for medical reasons).

On October 6, 2014, Plaintiff submitted a request asking for his Nitrostat.  He said he had

been having chest pains all night and pain from his right hand up to the back of his neck.  *Cty.*

*Ex.* A-1 at 206.  Plaintiff was taken to Washington Regional Medical Center because of his

complaints of chest pain.  *Id.* at 127.  He was discharged with a diagnosis of epigastric pain.  *Cty.*

*Ex.* A-1 at 125-126; *see also Cty. Ex.* B at 39-41.

On October 7, 2014, Plaintiff asked to be allowed to keep his mat and blanket all day.

*Cty. Ex.* A-1 at 206.  Nurse Bradley responded that there was no medical reason he needed his

mat and blanket all day.  *Id.*

On October 14, 2014, Plaintiff submitted a request stating he needed his blood work

done.  *Cty. Ex.* A-1 at 207.  He said he had Hepatitis A, B, and C.  *Id.*  He indicated he was

concerned because he had lost 24 pounds.  *Id.*  He was seen by Dr. Mullins for his complaint of

weight loss and for blood work.  *Cty. Ex.* A-1 at 128.  The results of the complete blood count

(CBC) were within normal limits, with the exception of the lymphocytes which were slightly

high and the absolute eosinophil and absolute basophils which were slightly low.  *Id.* at 129.

Plaintiff believed Dr. Mullins should have also checked his liver enzymes.  *Cty. Ex.* B

at 47-48.  Plaintiff believed his liver was shutting down.  *Id.*  He concedes, however, that it was

not.  *Id.* at 48.  In responses to interrogatories, Dr. Mullins states: "Plaintiff made no request to

me regarding his heart or liver or any other chronic complaints."  *Plff's Ex.* H at 124.

On October 19, 2014, Plaintiff submitted a request to see the Jehovah's Witnesses to

have a Bible study. *Cty. Ex.* A-1 at 207. Chaplain Trueblood, a volunteer chaplain, stated he had

called Kingdom Hall and got voice mail. *Id.*; *see also Plff's Ex.* H at 136. Chaplain Trueblood

left a message for them to call and set up a visit. *Cty. Ex.* A-1 at 207.

A medical charge of $5 was made on October 24, 2014. *Cty. Ex.* A-1 at 224B. Plaintiff

requested his money back. *Id.* at 209. Nurse Bradley advised him that he was classified as a

"back for court" detainee by Texas, and they did not pay for his medical expenses while he was

at the WCDC. *Id.* She also advised him that he was not considered ADC committed until his

parole was violated, so the ADC would not pay his medical expenses. *Id.*

On October 30, 2014, a $4 charge was made on his commissary account. *Cty. Ex.* A-1

at 224B. Plaintiff requested the return of the funds. *Id.* at 210-211. He indicated he would keep

refusing the medication because he was not supposed to have to pay for it. *Id.* On October 31,

2014, Plaintiff was advised that the ADC only paid for doctor's visits and prescriptions and not

nurses' visits. *Id.* at 211.

On November 1, 2014, Plaintiff again complained about being charged for chronic care

medication. *Cty. Ex.* A-1 at 211. He also noted that he was being overcharged for nurse's visits.

*Id.* He demanded that all the money deducted for medical care or prescriptions be refunded. *Id.*

Nurse Lee responded that this was not a medical request. *Id.*

On November 3, 2014, Plaintiff submitted a request complaining that some of his

requests and grievances were unanswered. *Cty. Ex.* A-1 at 212. In response, he was told

requests could not be deleted and he was receiving answers. *Id.*

On November 13, 2014, he submitted another grievance raising concerns about being

charged for medical care, not being weighed as the doctor ordered, not receiving the results of

-8-

his blood tests, and there being no follow-up care provided regarding his loss of weight. *Cty. Ex.* A-1 at 137, 208, 213. Nurse Bradley responded that he kept refusing to come to pill call. *Id.* at 215. She also stated they could not provide him medical care if he did not comply with the treatment he was offered. *Id.*

On November 14, 2014, Plaintiff said he would refuse his medications so long as he was charged for them. *Cty. Ex.* A-2 at 134. He continued to refuse his medications. *Cty. Ex.* A-2 at 140-154, 156-165, 166. Plaintiff testified he never started taking the medications again while at the WCDC. *Cty. Ex.* B at 45-46.

On November 18, 2014, Plaintiff submitted a request clarifying that he was only refusing the medication he was being charged for. *Cty. Ex.* A-1 at 214. He said he was not refusing other treatment. *Id.* He also requested that his Texas medical records be obtained. *Id.*

On December 15, 2014, he was taken to the sergeant's office, and it was explained to him again that he was not property of the ADC because his parole had not yet been violated. *Cty. Ex.* A-1 at 217-218. He was also told his court date was December 17, 2014. *Id.* It was noted that they went over each complaint he had with him. *Id.*

On December 18, 2014, Plaintiff submitted a request stating he was trying to appeal several grievance responses so that he had exhausted his administrative remedies. *Cty. Ex.* A-1 at 217. The grievance was closed since they had just gone over each complaint he had. *Id.* at 218.

On January 19, 2015, Plaintiff was charged $3 for a nurse's visit. *Cty. Ex.* A-1 at 224B. On February 7, 2015, Plaintiff requested his TDCJ records under the name Charlie Ray Starr. *Id.* at 222. In response, he was sent a medical release form to sign. *Id.*

-9-

On February 11, 2015, Plaintiff was sentenced on aggravated robbery. *Id.* at 29-30. On February 27, 2015, Plaintiff was released to Texas. *Id.* at 31-33.

Plaintiff testified that he believes Sheriff Helder should be held liable because he had Plaintiff picked up in Texas without his medical records. *See also Cty. Ex.* B at 20. Plaintiff does not believe Sheriff Helder directed his deputies to pick him up without his records. *Id.* If he had picked up his medical records from Texas, Plaintiff states Sheriff Helder would have discovered that Plaintiff should be provided chronic care free of charge. *Id.* at 21-22. Similarly, if Sheriff Helder had obtained Plaintiff's records from the ADC, he would have seen the ADC does not charge inmates for their chronic medical care. Plaintiff testified the ADC had been providing chronic care free since at least 1978; the first time Plaintiff was incarcerated there. *See also Cty. Ex.* B at 21-22, 25-26. Plaintiff also stated that Sheriff Helder refused to answer his grievances. *Id.* at 27-28.

By affidavit, Sheriff Helder says he was not personally involved in any of the incidents referenced in Plaintiff's complaint. *Cty. Ex.* C at ¶ 4. He states he makes no decisions regarding medical care given to particular inmates. *Id.* at ¶ 5. Further, he states he did not review or respond to any of Plaintiff's grievances. *Id.* at ¶ 7.

Plaintiff testified the witnesses he wanted affidavits from were ADC inmates. Plaintiff was trying to obtain the affidavits for the purpose of showing ADC committed inmates are not charged to chronic care even when they are being held in a county jail. For purposes of this motion, the Court will assume the affidavits would so state.

With respect to his claim that his Freedom of Religion was infringed, Plaintiff testified he wanted to be baptized by a Jehovah's witness. On June 8, 2014, Plaintiff asked when the

-10-

Jehovah's witnesses would be at the jail. *Cty. Ex.* A-1 at 186.  He was told there should be someone from the Fayetteville Kingdom there the following day.  *Id.*  On two occasions a Jehovah Witness volunteer, Dedrick Rowe, came and saw the Plaintiff.  *Cty. Ex.* B at 33.  Rowe indicated he was willing to baptize the Plaintiff if he was allowed to do so.  *Id.* at 34.

Plaintiff submitted a request on July 20, 2014, to be baptized by Elders of the local Jehovah's Witnesses congregation.  *Cty. Ex.* A-1 at 195.  Chaplain Trueblood, who is not a party to this case, responded that for security and safety reasons the only people authorized to baptize in the jail were the chaplains.  *Id.*  There were three chaplains who could perform baptisms. *Plff's Ex.* H at 136-137.  For anyone other than the jail chaplains to perform baptisms, Sheriff Helder, or his designee, Chaplain Earl Adams, would have to approve it.  *Id.* at 141-143.

According to Plaintiff, the Chaplains that were available to baptize him were of the Baptist faith.  *See also Cty. Ex.* B at 72-73.  Plaintiff testified he did not know if the procedures and wording were different for the ceremony, but he felt a person should be baptized by someone of his own faith.  *Id.*  Plaintiff had not been baptized previously because it had never been arranged.  *Id.* at 74.

Plaintiff admitted he failed to exhaust his administrative remedies on this claim.  Further, he testified he did not follow up on the response, to even determine how to get someone of his faith authorized to perform baptisms at the WCDC.

Plaintiff testified that he did not contend a policy, custom, or practice of Washington County was the moving force behind the violations of his constitutional rights.  Further, while he maintains he is entitled to compensatory damages, he testified there was no basis for an award of punitive damages against Washington County.

-11-

With respect to Nurse Lee, Plaintiff testified she asked him to complete the same form to get medical records from Texas and Arkansas. *See also Cty. Ex.* B at 61-62.  However, when it was discovered that Nurse Bradley had already sent the form, the second one was not sent. Nurse Bradley also faxed to the ADC a health services request form on which Plaintiff states he was committed and should not be charged for any medical. *Plff's Ex.* A at 22-23.  The ADC responded that it would not pay until the Plaintiff's parole was revoked because he was not an ADC inmate until that happened. *Plff's Ex.* I at 78.[4]  Texas indicated it did not pay for Plaintiff's medical when he was back in Arkansas for court. *Id.*  Nurse Lee, in response to an interrogatory, indicated she did not charge Plaintiff's commissary account for doctor visits, nurse's visits, or medication. *Plff's Ex.* J at 170.

Nurse Lee only responded to a single request/grievance made by the Plaintiff. *Plff's Ex.* I at 80; *SHP Ex.* 4.  By affidavit, Nurse Lee notes that, as Regional Administrator, her "primary duties included supervising and training nurses working" at the WCDC. *SHP Ex.* 2 at ¶ 4. Further, she stated her "primary duties did not include answering routine sick calls." *Id.* at ¶ 5.

Plaintiff indicated he only saw Nurse Harris a single time.  He believed she violated his rights by charging him for telling him the results of his blood work and also failing to answer his grievances. *See Cty. Ex.* B at 65-66.  He testified that on one occasion he was called into the office to talk to both Nurse Lee and Nurse Harris.

By affidavit, Nurse Harris said she was not a permanent employee at the WCDC and only worked there on the night shift on November 13, 14, 16, 17, and 18, and day shift on November 29, 2014. *SHP Ex.* 3 at ¶ 3.  Nurse Harris wrote that the Plaintiff kept refusing to come to pill

---

[4]Page citations are to the page numbers on the lower right corner not to the cm/ecf page numbers.

-12-

call. *Plff's Ex.* I at 28.  She stated they could not provide him with medical care when he kept refusing treatment.  *Id.*  Plaintiff testified he was refusing the treatment because it was for chronic care and he should not have to pay for it.  Plaintiff testified he was charged a total of $24 for medication and/or medical treatment.

In response to an interrogatory, Nurse Harris indicated that the jail doctor had prescribed the following medications to the Plaintiff while he was at the WCDC: "Metoprolol for heart, Enalapril for heart, Pravastatin for high cholesterol, C[i]tal[o]pram for depression, Lorazepam for anxiety, Topiramate for prevention of seizures and/or migraines, Propranolol for heart." *Plff's Ex.* J at 176.  Nurse Harris also states that she did not take money from Plaintiff's commissary account for any reason.  *Id.* at 177.

With respect to Nurse Bradley, Plaintiff testified she did not take his vitals and just wanted to argue about getting his medical records.  *Cty. Ex.* B at 52.  Plaintiff asserts that Nurse Bradley refused to answer any of his requests and grievances that dealt with his medical records and his being charged for medical care.  *Id.* at 53-54.  However, Plaintiff testified there was no medical care that she should have given him.  *Id.*  He also does not believe Nurse Bradley responded to his grievances appropriately.  *Cty. Ex.* B at 31.

By affidavit, Nurse Bradley states that any inmates who were not considered "property" of the ADC or the United States Marshal Service were required to pay a small co-pay for medicines, and nurse or doctor visits.  *Cty. Ex.* E at ¶ 4.  Nurse Bradley recalled that she initially had difficulty obtaining Plaintiff's records from Texas because he was booked under the alias Charlie Ray Starr with a different birth date.  *Id.* at ¶ 6.  She further indicates the TDCJ did not agree to pay for Plaintiff's medical care while he was in the WCDC.  *Id.* at ¶ 7.  Further, she

-13-

asserts there was "no indication" that Plaintiff was ADC property.  *Id.*

When Dr. Mullins ordered weight checks for four weeks, Plaintiff indicates the deputies only weighed him two times in the four week period.  Plaintiff testified that he did not seek follow-up care because of his weight loss.  Plaintiff has never found out what was causing his weight loss; however, when he got back to the TDCJ, he stopped losing weight.  *Cty. Ex.* B at 50.

With respect to Dr. Mullins, Plaintiff testified Dr. Mullins refused to provide free medical care in connection with Plaintiff's chronic care issues.  *Cty. Ex.* B at 37.  Plaintiff complained that he was charged for the medications even though he was refusing them.  *Id.* at 38.  Further, Plaintiff testified that had the doctor obtained his medical records from Texas and the ADC, Dr. Mullins would have been aware of the fact that Plaintiff needed heart medication.  *Id.* at 39.

Plaintiff believes Dr. Mullins should have done something more than an x-ray of his right side to determine the cause of the pain.  *Cty. Ex.* B at 47.  Plaintiff points out that the x-ray did nothing to explain the source of the pain in his right side.  *Id.*  However, Plaintiff testified that there was no other medical care that he believes Dr. Mullins should have provided.  *Id.* at 54.

Plaintiff testified he is still experiencing the right sided pain, but he knows now that it is coming from his liver.  *Cty. Ex.* B at 48-49.  He does not currently take pain medication for it because he does not like taking medication.  *Id.*

## 2.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any

-14-

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

**3.  Discussion**

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

**A.  The Washington County Defendants' Motion**

The Washington County Defendants, Sheriff Helder, Dr. Mullins, Nurse Bradley, and

-15-

Deputy Stanton, contend they are entitled to summary judgment on the following grounds: (1) Sheriff Helder was not personally involved in any of the alleged constitutional violations; (2) there was no deliberate indifference to Plaintiff's serious medical needs; (3) Plaintiff's Freedom of Religion rights were not violated; (4) no constitutional claim is stated by the alleged inadequacies in the grievance procedure; (5) they did not discriminate against the Plaintiff; (6) Defendants are entitled to qualified immunity in their individual capacity; (7) there is no basis for official capacity liability; and, (8) there is no basis for the imposition of punitive damages.

### Individual Capacity Liability of Sheriff Helder

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability. *See Monell v. Department of Social Services*, 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone County Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted); *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability").

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)); *Keeper*, 130 F.3d at 1314

-16-

(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993) (section 1983 liability requires some personal involvement or responsibility). Here, Plaintiff has established no causal link or direct responsibility of Sheriff Helder to the alleged deprivation of rights, and Sheriff Helder is entitled to summary judgment.

### Claims Against the County Medical Defendants

"Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The Eighth Amendment deliberate indifference standard applies to all denial of medical care claims. *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012). The deliberate indifference standard has both an objective and a subjective component. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). A plaintiff must demonstrate that (1) he suffered an objectively serious medical need, and (2) the defendant actually knew of the medical need but, subjectively, was deliberately indifferent to it. *Grayson v. Ross*, 454 F.3d 802, 808-09 (8th Cir. 2006).

On motion to dismiss, this Court found that it was permissible for a detention center to charge an inmate for medical care. Specifically, it was noted that while jails must provide basic medical care to inmates, there is no requirement that the jails provide the medical care free of cost. *See, e.g., Reynolds v. Wagner*, 128 F.3d 166, 173-74 (3rd Cir. 1997) (deliberate-indifference standard does not guarantee prisoners right to be entirely free from cost considerations that figure in medical-care decisions made by most non-prisoners in society). Inmates may be constitutionally required to pay for their own medical expenses, if they can

-17-

afford to do so. *Roberson v. Bradshaw*, 198 F.3d 645 (8th Cir. 1999); *cf. Jensen v. Klecker*, 648 F.2d 1179, 1183 (8th Cir. 1981) (no basis for due process claim where deductions from prisoner accounts were assessments for value received).

In *Garcia v. Lappin*, No. 06-C-94-C, 2006 WL 897857, *3 (W.D. Wis. Apr. 4, 2006), the court aptly stated:

> "Nothing in the Eighth Amendment requires the government to provide at no cost a commodity that would not be free outside the prison and that the inmate has the legal means to purchase. If a prison official withholds necessary medical care from an inmate with a serious medical need who cannot afford to pay, the official's action would violate the inmate's constitutional rights, but insisting that an inmate with sufficient funds pay for his own medical care is neither deliberate indifference nor punishment."

*Id.*

Plaintiff seeks to distinguish his situation by arguing that the care he received is for chronic conditions for which he received free medical care while in the TDCJ or the ADC. The Plaintiff attempts to draw a line in the sand where none exists. Whether the inmate is receiving medical treatment for a chronic condition or not, no constitutional violation exists by the mere fact that the inmate is charged a minimal amount for medical care so long as the inmate is not deprived medical care if he cannot afford to pay.

Plaintiff does not argue he could not afford to pay the amounts charged or that he was denied medical treatment because of an inability to pay. Plaintiff quite simply did not want to pay the medical charges. *See Cty. Ex.* A-1 at 224A-224B (a total of $33 charged over the period of his incarceration at the WCDC). This does not state a constitutional violation.

Moreover, there is no genuine issue of material fact as to whether the County Medical Defendants exhibited deliberate indifference to any of Plaintiff's serious medical needs. Plaintiff

-18-

admitted that any delay in treatment was the result of his refusal of the medication.  Moreover, Plaintiff submitted no verifying medical evidence suggesting any delay adversely impacted his health.  *See, e.g., Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) ("when the inmate alleges that the delay in treatment is the constitutional deprivation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment") (internal quotation marks and citation omitted).  He testified he was no worse off when he left the detention center than when he arrived there.

With respect to the weight loss, Plaintiff does not argue the weight loss adversely impacted his health.  Further, Plaintiff did not pursue this issue with the medical staff.

### Freedom of Religion

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."  *Turner v. Safley*, 482 U.S. 78, 84 (1987).  "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *see also Cruz v. Beto*, 405 U.S. 319 (1972).

This right, however, is not without limitation.  The Supreme Court has recognized that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights."  *O'Lone*, 482 U.S. at 348.  "The free exercise right is limited insofar as a prisoner's adherence to religious practices may be regulated by prison authorities, so long as such regulations are' reasonably related to legitimate penological interests.'"  *Murphy v. Carroll*, 202 F. Supp. 2d 421, 424 (D. Md. 2002) (quoting *Turner*, 482 U.S. at 89; *O'Lone*, 482 U.S. at 348-349; *Cruz*, 405 U.S. at 322); *see also Thomas v. Gunter*, 32 F.3d 1258, 1259-60 (8th Cir. 1994).

-19-

Here, Plaintiff makes no argument that he was prohibited in anyway from worshiping or following the dictates of his religion.  Plaintiff was able to worship with others of his faith.  In fact, Chaplain Trueblood assisted him by contacting the local Kingdom Hall, and Plaintiff testified he was visited by Elders of the Kingdom Hall.

Plaintiff further testified that he did not exhaust his administrative remedies on this issue. When Chaplain Trueblood advised him that only the Chaplains were approved to perform baptisms, Plaintiff submitted no grievances regarding this issue.  Exhaustion is mandatory under § 1997e(a) of the Prison Litigation Reform Act.  42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).

### Grievance Procedure

"Inmates do not have a constitutionally protected right to a grievance procedure.  Because a state grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the state's grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000) (citations omitted); *see also Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994) (inmates have no constitutional right to grievance procedure); *Cancel v. Goord*, No. oo CIV 2042, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001) (inmate grievance procedures are not required by the Constitution and therefore a violation of such a procedure does not give rise to a § 1983 claim); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000) (inmate has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." *Blagman*, 112 F. Supp. 2d at 542 (citing *Flick v. Alba*,

AO72A
(Rev. 8/82)

932 F.2d 728, 729 (8th Cir. 1991)). A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." *Blagman*, 112 F. Supp. 2d at 542 (citation omitted). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel*, 2001 WL 303713, *3.

The lack of a meaningful grievance procedure did not deprive Plaintiff of access to the courts. Accordingly, this claim fails.

**<u>Discrimination</u>**

Plaintiff maintains out of state inmates were charged for chronic medications while Arkansas inmates were not. To allege a cognizable Equal Protection claim, Plaintiff must establish: (1) intentional or purposeful discrimination, and (2) a violation of a fundamental right, membership in a protected class, or different treatment of similarly situated inmates. *Phillips v. Norris*, 320 F.3d 844, 848 (8th Cir. 2003).

Prisoners are not a protected class. *Murray v. Dosal*, 150 F.3d 814 (8th Cir. 1998). There is no fundamental right to be provided free medical care. Therefore, Plaintiff must show that similarly treated classes of inmates are treated differently and that this difference bears no rational relation to any legitimate penal interest. *Phillips*, 320 F.3d at 848. Plaintiff contends he received his chronic care treatment and medications free of charge in both the TDCJ and the ADC.

He has not shown, however, the existence of any genuine issue of fact as to whether he was treated differently than other inmates of the WCDC that were similarly situated. He was in the custody of the WCDC awaiting trial on pending criminal charges. The TDCJ relinquished

-21-

custody of him so that he could be tried in Arkansas. Plaintiff was not committed to the ADC. Thus, he was not in the custody of either prison system under which he testified he was entitled to free medical care for chronic conditions. The WCDC did not provide chronic care free of charge, and the Equal Protection Clause does not require that it do so.

With respect to the affidavits Plaintiff was attempting to get, he testified as to what their content would be. The fact that some ADC inmates were not charged for chronic care while in the WCDC does nothing to establish that these inmates were similarly situated to the Plaintiff. As discussed above, the ADC did not regard Plaintiff as being a committed inmate. Under those circumstances, the ADC would not pay for Plaintiff's medical treatment and he was not entitled to free chronic care.

### Qualified Immunity

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the defendant is entitled to qualified immunity).

### Official Capacity Liability

Plaintiff testified there was no basis for official capacity liability. We, therefore, need not address this issue further.

### B. The SHP Defendants' Motion

The SHP Defendants, Nurse Lee and Nurse Harris, work for SHP. SHP was the contract medical carrier for the WCDC starting on November 1, 2014 and going through the time of Plaintiff's release from the WCDC. The SHP Defendants have moved for summary judgment

on the following grounds: (1) there is no right to free medical care whether a chronic condition is involved or not; (2) they exhibited no deliberate indifference to Plaintiff's serious medical needs; and, (3) they are entitled to qualified immunity.

### Failure to Obtain Medical Records

Plaintiff maintains both Nurse Harris and Nurse Lee violated his rights by failing to obtain his medical records from the TDCJ and the ADC.  Plaintiff's reason for wanting the records, however, was not to provide continuity of care; but rather, he wanted the records obtained so he could show he was receiving "chronic care" free of charge.  Because he was not being charged at the TDCJ or the ADC, Plaintiff believed that meant he should not be charged at the WCDC.

The alleged failure of these Defendants to obtain Plaintiff's medical records does not constitute deliberate indifference to his serious medical needs.  Plaintiff  was offered the same medications he was on at the TDCJ, he just refused them because he was being charged a small co-pay.

### Charges for Medical Services

This argument has been resolved above.  Requiring Plaintiff to pay a portion of his medical care does not violate the constitution.  *See, e.g., Roberson*, 198 F.3d at 645.

As an aside, SHP also argues that it did not require Plaintiff to pay any part of his medical care; however, Plaintiff's commissary account does show a $3 nurse charge on January 19, 2015.  *Cty. Ex.* A-1 at 224B.

### Refusal to Respond, or Inadequate Responses to Grievance Procedures

This issue has also been resolved above.  Any alleged failure of these Defendants to

-23-

respond, or to respond fully, to Plaintiff's grievances does not constitute a constitutional violation. Plaintiff makes no argument that he was denied access to the Courts. In fact, he filed this lawsuit while incarcerated at the WCDC.

### **Qualified Immunity**

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### **4. Conclusion**

For the reasons stated, I recommend that the Washington County Defendants' summary judgment motion (Doc. 110) be **GRANTED**. Further, I recommend that SHP's motion for summary judgment (Doc. 24) be **GRANTED.** This case should be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED 2nd day of February, 2017.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)